[No. B177146. Second Dist., Div. Four. Nov. 29, 2005.]

OZGUR ARAL, Plaintiff and Respondent, v.
EARTHLINK, INC., Defendant and Appellant.

## Counsel

Seyfarth Shaw, Kenneth L. Wilton, Daniel M. Blouin and Christopher F. Robertson for Defendant and Appellant.

Westrup Klick, R. Duane Westrup, Lawrence R. Cagney; Law Offices of Allan A. Sigel, Allan A. Sigel, Christine C. Choi; Magana, Cathcart & McCarthy, Peter T. Cathcart and Richard L. Bisetti for Plaintiff and Respondent.

Bill Lockyer, Attorney General, Tom Greene, Chief Assistant Attorney General, Albert Norman Shelden, Assistant Attorney General, Ronald A. Reiter and Benjamin G. Diehl, Deputy Attorneys General, as Amicus Curiae on behalf of Plaintiff and Respondent.

## Opinion

**CURRY, J.**—Appellant EarthLink, Inc., appeals from an order denying its petition to compel arbitration of a putative statewide class action claim brought by respondent Ozgur Aral. The suit alleges that EarthLink charged fees to customers for digital subscriber line (DSL) service for a period prior to providing customers with the equipment necessary to utilize the service. The complaint was brought under the unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.), and seeks both injunctive and restitutionary relief on behalf of California residents who were affected by this practice. The trial court denied the petition on the ground that the gravamen of the complaint was injunctive relief, which cannot be obtained through arbitration.

We disagree with the trial court's ground for denying the petition. The claim for injunctive relief could have been severed from the claim for restitution, and the latter sent to arbitration. We nevertheless affirm. The arbitration provision in the DSL service agreement put forth as the parties' final agreement by EarthLink requires California consumers with minor monetary claims to arbitrate in Georgia and forbids class actions. Under recent Supreme Court authority, provisions in adhesion contacts that preclude class actions are unconscionable where the case involves allegations that a

large number of consumers have been cheated out of a small sum of money. Moreover, EarthLink sought an order specifying that arbitration of a minor monetary claim by a California resident take place in Georgia. A forum selection clause that discourages legitimate claims by imposing unreasonable geographical barriers is unenforceable under well-settled California law.

## FACTUAL AND PROCEDURAL BACKGROUND

The essential facts are that Aral, desiring to obtain faster Internet access, ordered DSL service from EarthLink in early June 2003. He did not receive the kit containing equipment needed to operate the service—a DSL modem—for approximately five weeks.[1] Yet when he received his EarthLink bill, he saw that he had been charged based on the date he ordered service.

EarthLink is a Delaware corporation with its principal place of business in Atlanta, Georgia. The DSL service agreement that EarthLink generally sent with the DSL installation kit to customers who, like Aral, ordered DSL service in June 2003 provided that the parties' agreement was "governed by Georgia law without regard to conflict-of-law provisions"; that "[a]ny controversy or claim arising out of or relating to this agreement, or the breach thereof, shall be settled by arbitration, and administered by the American Arbitration Association under its Commercial Arbitration Rules"; and that "[a]ny such arbitration will be governed by Georgia law and will be held in Atlanta, Georgia." It further provided: "There shall be no class action arbitration pursuant to this agreement."

Just prior to the provision mandating application of Georgia law was a provision "[u]nder California Civil Code Section 1789.3" which provided that "subscribers who are residents of California are entitled to the following specific consumer rights information: . . ." There followed the address and telephone number of the complaint assistance unit of the division of the consumer services of the California Department of Consumer Affairs.[2]

---

[1] EarthLink conceded that Aral ordered the kit in June 2003 and that it was not delivered until July 2003.

[2] As we understand it, EarthLink has both a standard form *Internet* service agreement and a separate standard form *DSL* service agreement. Presumably, DSL customers are not bound by the regular Internet service agreement but by the more specific DSL service agreement. According to the record, at some point, the standard form Internet service agreement was modified so that provisions were added to the information provided for California residents under Civil Code section 1789.3, including EarthLink's Georgia address and telephone number and a statement that "[c]harges vary depending [on] the type of service. . . . EarthLink reserves the right to change prices and institute new fees at any time upon 30 days prior notice." The following sentence was also added: "Actions arising from this agreement may be brought in an appropriate California small claims court." We do not have in our record a copy of any DSL service agreement containing these changes. The copy of the Internet service agreement

Individuals who install EarthLink DSL service using EarthLink-provided software cannot complete installation until they click on an icon indicating that they have read and agreed to the terms and conditions of the DSL service agreement. However, Aral stated in a declaration, which EarthLink did not contradict, that he installed the DSL service through alternate means known to him as a software engineer that did not require using the software provided or clicking on the icon.

### Complaint

Aral's complaint was filed July 25, 2003. It alleged that it was brought "on behalf of a class [of] customers of [EarthLink] who have been victims of [EarthLink's] practice of overcharging consumers for broadband access to the Internet." Specifically, the proposed class "consist[ed] of California residents who subscribed to [EarthLink's] Broadband Access Services, and were victims of [EarthLink's] practice of charging such persons for services during periods prior to [EarthLink's] provision of hardware necessary for members of the California UCL class to receive Broadband Access Services from [EarthLink]." The sole cause of action in the complaint was brought under the UCL, and sought an injunction and restitution of "all funds paid by [Aral] and other members of the general public as a result of any act or practice declared . . . to constitute unfair competition under [the UCL]."

### Petition to Compel Arbitration

On September 15, 2003, EarthLink sought to compel arbitration in Georgia and to dismiss or stay court proceedings. EarthLink, in its petition to compel arbitration, did not present to the court any version of the DSL service agreement containing the reference to California small claims court.[3] It initially argued that Aral was bound by the DSL service agreement because "[t]he software can be installed only if the individual first clicks on an icon indicating they have read and agreed to the terms and conditions of the Agreement." However, when Aral presented evidence that he had not installed the DSL service in that fashion, EarthLink changed its contention and argued that the parties had entered into a binding written agreement because "[t]he EarthLink Internet Service Agreement is also posted by means of 'hyperlinks' on the majority of the pages of EarthLink's website, including its

---

containing the language quoted *ante* was obtained from the Internet by counsel for Aral, and states that it became effective December 1, 2003.

[3] As we have said, the only agreement containing such language found in our record is an *Internet* service agreement. That agreement was introduced by Aral to show that such language did not come into existence until December 2003, subsequent to his decision to obtain DSL service.

home page"[4] and because "the EarthLink DSL Internet Service Agreement was mailed as part of EarthLink's User Guide to every customer receiving an EarthLink modem kit, including [Aral]."

The trial court denied the motion to compel arbitration, stating in its order that "claims for injunctive relief under [the UCL] are not arbitrable" and that, although arbitrable claims such as restitution, disgorgement, and unjust enrichment can generally be severed from nonarbitrable claims, "[i]n the case at bar . . . the gravamen of the case is the [Business and Professions Code] section 17200 claim for injunctive relief; there is essentially nothing to be severed."

EarthLink noticed a timely appeal from the denial of its petition to compel arbitration.

## DISCUSSION

### I

EarthLink contends that the trial court was incorrect in its determination that there was no arbitrable claim because the gravamen of the case was injunctive relief and there was nothing to be severed. We agree.

In *Cruz v. PacifiCare Health Systems, Inc.* (2003) 30 Cal.4th 303 [133 Cal.Rptr.2d 58, 66 P.3d 1157] (*Cruz*), the Supreme Court considered whether a claim for injunctive relief brought under the UCL was arbitrable. The court had previously held that claims for injunctive relief were not arbitrable in the case of *Broughton v. Cigna Healthplans* (1999) 21 Cal.4th 1066 [90 Cal.Rptr.2d 334, 988 P.2d 67] (*Broughton*), where a minor and his mother had sued for medical malpractice and for violations of the Consumers Legal Remedies Act (CLRA) (Civ. Code, § 1750 et seq.). Defendant in *Broughton* moved to compel arbitration under an arbitration clause in the health insurance plan. The trial court severed the causes of action, granted the petition to compel arbitration with respect to the medical malpractice claim, and denied arbitration with respect to the CLRA claim, which sought damages and injunctive relief relating to allegedly deceptive advertising. The Supreme Court affirmed in part and reversed in part, holding that the injunctive relief action must be decided in a judicial forum, but that all other claims, including the damage claim under the CLRA, were amenable to arbitration. (*Broughton, supra,* 21 Cal.4th at p. 1088.)

---

[4] We assume from this statement and statements contained in a declaration from Aral's counsel, that the *DSL* service agreement is not available on hyperlinks.

Not long after the opinion in *Broughton*, the United States Supreme Court decided two significant arbitration cases: *Green Tree Financial Corp.-Ala. v. Randolph* (2000) 531 U.S. 79 [148 L.Ed.2d 373, 121 S.Ct. 513] (*Green Tree*), and *Circuit City Stores, Inc. v. Adams* (2001) 532 U.S. 105 [149 L.Ed.2d 234, 121 S.Ct. 1302] (*Circuit City*). Defendant in *Cruz* argued that the holdings in those two cases required the California Supreme Court to reconsider its position on the arbitrability of claims for injunctive relief. Our Supreme Court analyzed the two cases and disagreed: "In *Circuit City, supra*, 532 U.S. 105, the court concluded that section 1 of the FAA, which exempts from the scope of the FAA 'contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce' (9 U.S.C. § 1), did not exempt most employment contracts. . . . The majority rejected the position of various amici curiae, including attorneys general of 22 states, who argued that applying the FAA to employment contracts would interfere with the employment policies of the states. . . . The *Circuit City* court did not address the central question in *Broughton*—whether public injunctions were arbitrable. . . . [¶] Still less is *Green Tree, supra*, 531 U.S. 79, relevant to *Broughton*. That case was narrowly focused on the issue of cost sharing in the arbitration of federal statutory claims. *Green Tree*'s holding did not concern federal preemption of state arbitration claims. Nor did its reiteration of Congress's strong pro-arbitration policy [citation] call *Broughton* into question. . . . [¶] In sum, nothing that is novel about *Green Tree* or *Circuit City* has any bearing on *Broughton*. The only parts of these opinions that remotely pertain to *Broughton* are recapitulations of familiar themes regarding the importance of enforcing arbitration agreements and the inability of states to prevent that enforcement. These were amply considered in *Broughton*." (*Cruz, supra*, 30 Cal.4th at p. 314.)

Based on its conclusion that *Circuit City* and *Green Tree* did not overrule *Broughton*'s holding that claims for injunctive relief under the CLRA were not arbitrable, the court in *Cruz* further held that claims seeking injunctive relief under the UCL and under Business and Professions Code section 17500 for false advertising were similarly inarbitrable. The court went on to hold, however, that it would be error to extend the holding in *Broughton* to other equitable claims such as claims for restitution and disgorgement under the UCL. "[T]here appears to be no reason why restitutionary claims, like CLRA claims for damages, should not be arbitrable. Nothing in *Broughton*'s functional analysis suggests that the mere designation of restitution as an equitable remedy makes the request for the remedy inarbitrable. Moreover, although [plaintiff] argues that restitution under the UCL accomplishes a public purpose by deterring unlawful conduct, the same could be said of damages under the CLRA or under various federal statutes. This deterrent effect is, however, incidental to the private benefits obtained from those bringing the restitutionary or damages action. [Citation.] The Supreme Court

has made clear that such actions, notwithstanding the public benefit, are fully arbitrable under the FAA. [Citation.]" (*Cruz, supra,* 30 Cal.4th at p. 318.)

The Court of Appeal in *Cruz* had held that the restitutionary claims were inarbitrable specifically because they were brought as a class action. The Supreme Court explained: "It may be the case that under the UCL, a class action would allow for disgorgement into a fluid recovery fund and distribution by various means. [Citations.] But the establishment of such a fund and the distribution of its proceeds does not present the same order of institutional difficulty as does the maintenance of a permanent statewide injunction requiring judicial supervision. We agree with the one published case on this issue that '[u]nlike a public injunction, disgorgement of funds does not need to be continuously monitored because its object is limited in time and scope. Once the profits to be disgorged and the recipients of those funds are identified, there is no need for long term modification and correction necessitating judicial supervision. Therefore, . . . disgorgement of funds is essentially the same as awarding money damages, and within the power of the arbitrators to award. [T]here is no "inherent conflict" between this remedy and arbitration.' " (*Cruz, supra,* 30 Cal.4th at p. 318, quoting *Arriaga v. Cross Country Bank* (S.D.Cal. 2001) 163 F.Supp.2d 1189, 1197.)

■ Under the holding in *Cruz,* when a party brings a claim under the UCL seeking both injunctive and restitutionary relief and the dispute is subject to arbitration, the proper procedure is to sever the claim for injunctive relief and compel arbitration of the claim for restitutionary relief only. Aral is seeking both injunctive relief and restitution of funds which were allegedly acquired by means of unfair business practices. Thus, the trial court erred in ruling that the entire claim should go forward in court.

## II

Although the trial court did not reach the issues of whether the parties had entered into a binding agreement containing a valid arbitration clause and, if so, whether the clause could be enforced, the parties and amicus curiae Attorney General urge that we resolve these questions. The specific issues raised revolve around the provisions prohibiting class actions and requiring consumers to travel to Georgia to raise claims. Because the issues have been fully briefed and because they provide a basis for affirming the trial court's decision on alternate grounds, we accede to the parties' and the Attorney General's request.

## A

■ We begin our analysis by emphasizing that an arbitration agreement containing a forum selection clause and a clause forbidding class actions

must be treated in the same manner as any other contract containing such clauses. As the United State Supreme Court has made clear: "In instances [where defenses such as unconscionability are asserted], the text of § 2 [of the Federal Arbitration Act (FAA)] provides the touchstone for choosing between state-law principles and the principles of federal common law envisioned by the passage of that statute: An agreement to arbitrate is valid, irrevocable, and enforceable, *as a matter of federal law*, [citation], 'save upon such grounds as exist at law or in equity for the revocation of *any* contract.' 9 U. S. C. § 2 (emphasis added [by Supreme Court]). Thus state law, whether of legislative or judicial origin, is applicable *if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally. A state-law principle that takes its meaning precisely from the fact that a contract to arbitrate is at issue does not comport with this requirement of § 2. [Citations.] A court may not, then, in assessing the rights of litigants to enforce an arbitration agreement, construe that agreement in a manner different from that in which it otherwise construes nonarbitration agreements under state law. Nor may a court rely on the uniqueness of an agreement to arbitrate as a basis for a state-law holding that enforcement would be unconscionable, for this would enable the court to effect what we hold today the state legislature cannot." (*Perry v. Thomas* (1987) 482 U.S. 483, 492–493, fn. 9 [96 L.Ed.2d 426, 107 S.Ct. 2520].)

EarthLink attempts to persuade us that, under the FAA and federal authority, courts may do no more than determine certain "gateway" matters, such as whether the parties have entered into a valid agreement; whether the agreement contains an arbitration clause; and whether the claims fall within the scope of that clause. According to its brief, "any remaining procedural issues, such as the location of the arbitration, the law to be applied and the availability of collective action, are all for the arbitrator to decide." This line of argument has been put to rest by the recent Supreme Court decision in *Discover Bank v. Superior Court* (2005) 36 Cal.4th 148 [30 Cal.Rptr.3d 76, 113 P.3d 1100] (*Discover Bank*). There, the holder of a Discover credit card contended that Discover wrongly charged late fees if payments arrived after 1:00 p.m. on the last day for receipt of payment, instead of waiting until the end of the day. The issues in the case concerned the validity of a term in the parties' agreement forbidding classwide arbitration and a Delaware choice-of-law provision. The trial court followed the decision in *Szetela v. Discover Bank* (2002) 97 Cal.App.4th 1094 [118 Cal.Rptr.2d 862], which had held that a nearly identical class action waiver was unconscionable. The Court of Appeal reversed. Without deciding whether the class arbitration waiver was unconscionable or whether the choice-of-law provision was valid, the appellate court held that the FAA preempted any state law rules in those areas that might serve to negate the arbitration provision.

With respect to FAA preemption, the Supreme Court declared itself "puzzle[ed]" by the Court of Appeal's conclusion that "[w]hile a state may prohibit the contractual waiver of statutory consumer remedies, including the right to seek relief in a class action, such protections fall by the wayside when the waiver is contained in a validly formed arbitration agreement governed by the FAA.' (*Discover Bank, supra,* 36 Cal.4th at p. 165.) The Court of Appeal's conclusion "ignore[d] the critical distinction made by the *Perry* court between a 'state-law principle that takes its meaning precisely from the fact that a contract to arbitrate is at issue,' which is preempted by section 2 of the FAA, and a state law that 'govern[s] issues concerning the validity, revocability, and enforceability of contracts generally,' which is not." (*Ibid.,* quoting *Perry v. Thomas, supra,* 482 U.S. at p. 493, fn. 9.) As the Supreme Court explained, "the principle that class action waivers are, under certain circumstances, unconscionable as unlawfully exculpatory is a principle of California law that does not specifically apply to arbitration agreements, but to contracts generally. In other words, it applies equally to class action litigation waivers in contracts without arbitration agreements as it does to class arbitration waivers in contracts with such agreements. [Citation.] In that important respect it differs from the provision under consideration in *Perry,* which singled out certain arbitration agreements as unenforceable." (*Discover Bank, supra,* at pp. 165–166.) Put simply, "Nothing in . . . any . . . [United States] Supreme Court case . . . suggests that state courts are obliged to enforce contractual terms even if those terms are found to be unconscionable or contrary to public policy under general contract law principles." (*Id.* at p. 166.) We, therefore, proceed with our determination of whether the class action prohibition and forum selection clause are enforceable under general contract law principles.

## B

■ The ultimate holding in *Discover Bank* addressed the validity of the class action waiver. The Supreme Court began its analysis of the issue by reiterating the general principles used to determine whether a contractual provision is unconscionable. The court explained that " 'the doctrine has " 'both a "procedural" and a "substantive" element,' the former focusing on ' "oppression" ' or ' "surprise" ' due to unequal bargaining power, the latter on ' "overly harsh" ' or ' "one-sided" ' results." [Citation.]' " (*Discover Bank, supra,* 36 Cal.4th at p. 160, quoting *Little v. Auto Stiegler, Inc.* (2003) 29 Cal.4th 1064, 1071 [130 Cal.Rptr.2d 892, 63 P.3d 979].) The procedural element " 'generally takes the form of a contract of adhesion, " 'which, imposed and drafted by the party of superior bargaining strength, relegates to

the subscribing party only the opportunity to adhere to the contract or reject it.' " ' " (*Discover Bank, supra,* at p. 160.) Terms that are unconscionable substantively " 'may take various forms, but may generally be described as unfairly one-sided.' " (*Ibid.*)

With respect to whether the agreement before it was procedurally unconscionable, the court stated: "[W]hen a consumer is given an amendment to its cardholder agreement in the form of a 'bill stuffer' that he would be deemed to accept if he did not close his account, an element of procedural unconscionability is present." (*Discover Bank, supra,* 36 Cal.4th at p. 160.)

■ The court further recognized that class action waivers may be substantively unconscionable "inasmuch as they may operate effectively as exculpatory contract clauses that are contrary to public policy." (*Discover Bank, supra,* 36 Cal.4th at p. 161.) Even though a class action waiver may not be literally exculpatory, " ' "the class action is often the only effective way to halt and redress [the] exploitation" ' " that results when " ' "[a] company . . . wrongfully exacts a dollar from each of millions of customers." ' " (*Ibid.,* quoting *Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 446 [97 Cal.Rptr.2d 179, 2 P.3d 27].) Such class action waivers are "indisputably one-sided," and the Supreme Court reiterated the statement of the Court of Appeal in *Szetela* that " '[a]lthough styled as a mutual prohibition on representative or class actions, it is difficult to envision the circumstances under which the provision might negatively impact Discover [Bank], because credit card companies typically do not sue their customers in class action lawsuits.' " (*Discover Bank, supra,* at p. 161, quoting *Szetela v. Discover Bank, supra,* 97 Cal.App.4th at p. 1101.)

The Supreme Court was not willing to go so far as to say that "all class action waivers are necessarily unconscionable." But the majority agreed with the following principle: "[W]hen the waiver is found in a consumer contract of adhesion in a setting in which disputes between the contracting parties predictably involve small amounts of damages, and when it is alleged that the party with the superior bargaining power has carried out a scheme to deliberately cheat large numbers of consumers out of individually small sums of money, then, at least to the extent the obligation at issue is governed by California law, the waiver becomes in practice the exemption of the party 'from responsibility for [its] own fraud, or willful injury to the person or property of another.' (Civ. Code, § 1668.) Under these circumstances, such waivers are unconscionable under California law and should not be enforced." (*Discover Bank, supra,* 36 Cal.4th at pp. 162–163.)

■ In the present case, the terms of the agreement were presented on a "take it or leave it" basis either through installation of the software or through materials included in the package mailed with the software with no opportunity to opt out. This is quintessential procedural unconscionability. With respect to substantive unconscionability, Aral alleged in his complaint that EarthLink began charging customers for DSL service as soon as they ordered the service although the company knew or should have known that the service would not be available until after the modem was delivered, some weeks later. Although Aral did not allege fraud, the gravamen of the complaint is that numerous consumers were cheated out of small sums of money through deliberate behavior. Accepting these allegations as true, as we must at this stage of the proceedings, the class action waiver must be deemed unconscionable under California law.

## C

■ We turn to the question of the enforceability of the forum selection clause. As with the class action waiver, we make this determination utilizing general contract law principles without regard to the fact that it appears in an arbitration agreement. (*Perry v. Thomas, supra,* 482 U.S. 483.)

In *Smith, Valentino & Smith, Inc. v. Superior Court* (1976) 17 Cal.3d 491 [131 Cal.Rptr. 374, 551 P.2d 1206] (*Smith*), the Supreme Court laid out the general rule that governs the validity of contractual forum selection clauses: "No satisfying reason of public policy has been suggested why enforcement should be denied a forum selection clause appearing in a contract entered into freely and voluntarily by parties who have negotiated at arm's length. For the foregoing reasons, we conclude that forum selection clauses are valid and may be given effect, in the court's discretion and in the absence of a showing the enforcement of such a clause would be unreasonable." (*Id.* at pp. 495–496.) The contract at issue in *Smith* was negotiated between two corporations, one a Pennsylvania corporation and one a California corporation. Each agreed to initiate litigation only in the other's home state. The court held that evidence of mere inconvenience and additional expense was not sufficient to establish that the forum selected was unreasonable. (*Id.* at p. 496.)

Following *Smith*, a number of California courts enforced forum selection clauses where the contract was between businesses of relatively equal bargaining strength, even where litigating in the forum selected was likely to be extremely inconvenient for the aggrieved party. (See, e.g., *CQL Original Products, Inc. v. National Hockey League Players' Assn.* (1995) 39 Cal.App.4th 1347, 1353–1354 [46 Cal.Rptr.2d 412] [contract between a California corporation which produced and marketed vinyl products depicting

the likenesses of popular television stars, music entertainers, and professional athletes and National Hockey League Players' Association with Canada as designated forum]; *Cal-State Business Products & Services, Inc. v. Ricoh* (1993) 12 Cal.App.4th 1666, 1678 [16 Cal.Rptr.2d 417] [contract between an office product manufacturer and a California dealer where forum selected was New York]; see also *Lu v. Dryclean-U.S.A. of California, Inc.* (1992) 11 Cal.App.4th 1490, 1493 [14 Cal.Rptr.2d 906] [court enforced forum selection clause directing that litigation take place in Dade County, Florida, in a lawsuit brought by franchisee who resided in California even though the franchise agreement was negotiated in California with a California subsidiary of a Florida parent and the Florida corporation was not a party to the agreement].)

Moreover, despite the language in *Smith* seemingly limiting enforcement to situations where the contract was "entered into freely and voluntarily by parties who have negotiated at arm's length," (*Smith, supra,* 17 Cal.3d at p. 496), forum selection clauses have been enforced where the contract had the basic qualities of an adhesion contract—"a standardized contract, imposed upon the subscribing party without an opportunity to negotiate the terms." (*Intershop Communications AG v. Superior Court* (2002) 104 Cal.App.4th 191, 201 [127 Cal.Rptr.2d 847].) In *Intershop Communications,* the plaintiff was a California employee of the United States subsidiary of a German corporation. He sued for breach of a stock options exchange agreement, claiming that he was due 7,812 more shares valued at more than $5 million. The court concluded that plaintiff was "correct in his characterization of the exchange agreement as a contract of adhesion." (*Ibid.*) Nevertheless, the court enforced the forum selection clause requiring litigation to take place in Germany because "[p]laintiff made no showing in the trial court that substantial justice could not be achieved in a German court or that a rational basis is lacking for the selection of Hamburg as the forum. Indeed, enforcement of the forum selection clause makes sense under the circumstances here, where the options are for stock in a German corporation subject to German securities regulations and where the parties agreed that German law would apply." (*Id.* at p. 200.)

In 1991, the United States Supreme Court weighed in on the validity of forum selection clauses in a case governed by federal admiralty law, *Carnival Cruise Lines, Inc. v. Shute* (1991) 499 U.S. 585 [113 L.Ed.2d 622, 111 S.Ct. 1522] (*Shute*). Plaintiffs in *Shute* were residents of Washington. They purchased tickets for a Los Angeles to Mexico roundtrip cruise from a Florida-based cruise line. Once they paid their fare, they received tickets from the cruise line containing fine print limiting litigation to Florida courts. While in international waters, the wife suffered a slip-and-fall injury. The Supreme Court "d[id] not address the question [of] whether [plaintiffs] had sufficient notice of the forum clause before entering the contract for passage" because

plaintiffs "essentially have conceded that they had notice of the forum-selection provision." (*Id.* at p. 590.) The court further noted that there had been no factual findings "regarding the physical and financial impediments to [plaintiffs'] pursuing their case in Florida." (*Id.* at p. 594.) The court also found significant "the fact that [the wife's] accident occurred off the coast of Mexico," which meant that the dispute was not "an essentially local one inherently more suited to resolution in the State of Washington than in Florida." (*Ibid.*) "In light of these distinctions, and because [plaintiffs] do not claim lack of notice of the forum clause," the court "conclude[d] that they have not satisfied the 'heavy burden of proof,' [citation], required to set aside the clause on grounds of inconvenience." (*Id.* at pp. 594–595.)

In so holding, the Supreme Court emphasized that "forum-selection clauses contained in form passage contracts *are* subject to judicial scrutiny for *fundamental fairness*. In this case, there is no indication that [the cruise line] set Florida as the forum in which disputes were to be resolved as a means of discouraging cruise passengers from pursuing legitimate claims. Any suggestion of such a bad-faith motive is belied by two facts: [the cruise line] has its principal place of business in Florida, and many of its cruises depart from and return to Florida ports. Similarly, there is no evidence that [the cruise line] obtained [plaintiffs'] accession to the forum clause by fraud or overreaching. Finally, [plaintiffs] have conceded that they were given notice of the forum provision and, therefore, presumably retained the option of rejecting the contract with impunity." (*Shute, supra,* 499 U.S. at p. 595, italics added.)

Following *Shute,* in *Carnival Cruise Lines, Inc. v. Superior Court* (1991) 234 Cal.App.3d 1019 [286 Cal.Rptr. 323], the Court of Appeal reversed an earlier holding that the selection of a Florida forum for California residents injured during a similar Los Angeles to Mexico cruise " 'constitute[d] an instance of untenable "overreaching" by [the cruise line].' " (*Id.* at p. 1025.) The Court of Appeal sent the matter back to the trial court to determine whether plaintiffs had actual notice. (*Id.* at p. 1026.) "Absent such notice, the requisite mutual consent to that contractual term is lacking and no valid contract with respect to such clause . . . exists." (*Id.* at p. 1027.)

Despite the limited nature of the holdings in *Shute* and *Carnival Cruise Lines, Inc.,* and the fact that their only direct precedential value is in cases governed by federal admiralty law, they have been repeatedly cited to justify enforcement of forum selection clauses in nonnegotiated form contracts between consumers and business entities that supply consumer goods and services. For example, the court in *Hunt v. Superior Court* (2000) 81 Cal.App.4th 901 [97 Cal.Rptr.2d 215], relied on *Shute* and *Carnival Cruise Lines, Inc.* to reformulate the rule governing enforcement of forum selection clauses as follows: "Courts will enforce forum selection clauses contained in

a contract freely and voluntarily negotiated at arm's length unless enforcement would be unfair or unreasonable. (*Smith, Valentino & Smith, Inc. v. Superior Court*[, *supra*, 17 Cal.3d at pp. 495–496].) Although the forum selection clause here is contained in an adhesion contract, that clause in an adhesion contract is enforceable even though the defendant did not actually read it ([*Shute, supra*, 495 U.S. at pp. 590–595]) as long as the clause provided adequate notice to the defendant that he was agreeing to the jurisdiction cited in the contract. (*Carnival Cruise Lines, Inc. v. Superior Court*[, *supra*, 234 Cal.App.3d at pp. 1026–1027].) However, when the clause does not give adequate notice to the defendant that he is agreeing to the jurisdiction cited in the contract, 'the requisite mutual consent to that contractual term is lacking and no valid contract with respect to such clause thus exists. [Citations.]' " (*Hunt v. Superior Court, supra*, at p. 908, quoting *Carnival Cruise Lines, Inc. v. Superior Court, supra*, at p. 1027.)

A focus on notice over reasonableness underlies the case primarily relied on by EarthLink to support its contention that the forum selection clause in the DSL service agreement is enforceable: *Net2Phone, Inc. v. Superior Court* (2003) 109 Cal.App.4th 583 [135 Cal.Rptr.2d 149]. The suit there was brought under the UCL by an entity that called itself Consumer Cause against Net2Phone, a New Jersey provider of Internet telecommunication services. Net2Phone had allegedly failed to inform consumers of its practice of rounding up to the nearest minute when charging for telephone calls. Consumer Cause purported to be acting as a "private attorney general" on behalf of the consumers who had entered into agreements with defendant. The court concluded that the forum selection clause could be enforced against Consumer Cause, a nonparty to the agreement, since it purported to assert the rights of those who are parties to the contract and "stands in the shoes of those whom it purports to represent." (*Id.* at p. 589.) Addressing the manner of the contract's formation, the court perceived "no unfairness in Net2Phone's requirement that certain contractual terms must be accessed via hyperlink, a common practice in Internet business. The fact that the forum selection clause may have been a 'take it or leave it' proposition, and not vigorously 'bargained for' as Consumer Cause contends, does not make the clause unenforceable." (*Id.* at pp. 588–589, citing *Shute, supra*, 495 U.S at pp. 593, 601.) Noting that "Consumer Cause does not claim Net2Phone's customers would not be adequately protected were they required to pursue their claims in New Jersey" and that Consumer Cause's only grievance was the "los[t] opportunity to recover attorney's fees," the court concluded that the forum selection clause should be enforced. (*Id.* at p. 590.)

The dissent in *Net2Phone* believed that public policy precluded enforcement of the forum selection clause under the circumstances presented. Focusing on the fact that California's UCL conflicted with New Jersey's similar Consumer Fraud Act in that New Jersey did not allow private attorney general actions, the dissent stated: "The majority's opinion eviscerates the UCL by ordering the dispute to a jurisdiction that does not permit private attorneys general to prosecute a statutory unfair competition action." (*Net2Phone, Inc. v. Superior Court, supra,* 109 Cal.App.4th at p. 592 (dis. opn. of Mosk, J.).) Thus, according to the dissent, the majority disregarded an earlier opinion in which the same division had noted that " ' "representative UCL actions make it economically feasible to sue when individual claims are too small to justify the expense of litigation, and thereby encourage attorneys to undertake private enforcement actions." ' " (*Ibid.,* quoting *Rosenbluth Internat., Inc. v. Superior Court* (2002) 101 Cal.App.4th 1073, 1077 [124 Cal.Rptr.2d 844].)

■ Although we agree with the dissent in *Net2Phone* that consumers with small monetary claims are ill served by a consumer protection scheme that prohibits private attorney general actions, we approach the problem from a different perspective. We believe that a forum selection clause that requires a consumer to travel 2,000 miles to recover a small sum is not reasonable under either *Smith, supra,* 17 Cal.3d 491, or *Shute, supra,* 499 U.S. 585. Although both the California Supreme Court and the United States Supreme Court place a heavy burden on the plaintiff who seeks to prove that a forum selection clause is unreasonable, particularly where the alleged unreasonableness is based on the additional expense and inconvenience of litigating far from home, the burden was not intended to be insurmountable. If it is clear that "trial in the contractual forum will be so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court," it would be "unfair, unjust, [and] unreasonable" to enforce the forum selection provision. (*The Bremen v. Zapata Off-Shore Co.* (1972) 407 U.S. 1, 18 [32 L.Ed.2d 513, 92 S.Ct. 1907].) The claim here is that between the time DSL service is ordered and the time the modem arrives in the mail, consumers are charged for a service they cannot access for a period of four to five weeks. We cannot say at this point whether Aral's situation represents a one-time aberration or a regular practice. If the latter, there may well be a significant number of California consumers who have suffered losses in the range of $40 to $50 dollars. To expect any or all of them to travel to Georgia in order to obtain redress on a case-by-case basis, whether in a courthouse or in an arbitration hearing room, is unreasonable as a matter of law.

■ EarthLink contends that under AAA Consumer Rules, Aral and others similarly situated would not be precluded from bringing their claims for redress in California small claims court.[5] Presenting a consumer litigant who has suffered a small monetary loss with the Hobson's choice of litigation in a distant forum and the limited relief available in small claims court does not cure the problem. Small claims courts do not provide the panoply of relief available in court or before an arbitrator, such as punitive damages and attorney fees. Litigants also have no right to pursue class actions. In *Discover Bank*, the majority expressly disagreed with the argument "that small claims litigation, government prosecution, or informal resolution are adequate substitutes [for the availability of class action litigation]." (*Discover Bank, supra,* 36 Cal.4th at p. 162.) The same is true here. The possibility of redress in small claims court does not persuade us that a patently unreasonable forum selection clause should be enforced.

## D

In *Discover Bank*, the Supreme Court's holding that "the FAA does not prohibit a California court from refusing to enforce a class action waiver that is unconscionable" did not "bring a resolution to [the] case" because "[t]he agreement between Discover Bank and plaintiff has a Delaware choice-of-law agreement and Discover Bank argues that under Delaware law, a class arbitration waiver is enforceable." (*Discover Bank, supra,* 36 Cal.4th at p. 173.) The court, therefore, remanded the matter to the Court of Appeal to "address the question whether the Delaware choice-of-law provision requires the enforcement of the class arbitration waiver" under the principles set forth in the Restatement Second of Conflict of Laws (Restatement).[6] (*Ibid.*) In its supplemental brief, EarthLink cites several federal court opinions to support

---

[5] As we have seen, EarthLink modified its Internet service agreement so that it states: "Actions arising from this agreement may be brought in an appropriate California small claims court." Although there is no version of the DSL service agreement containing such language in our record, we presume from EarthLink's argument that it would not object to DSL customers bringing actions in small claims court.

[6] Section 187 of the Restatement provides that a court must first determine: whether "the chosen state has [a] substantial relationship to the parties or [their] transaction," or whether "there is [any] other reasonable basis for the parties['] choice [of law]." (Rest.2d Conf. of Laws, § 187, subd. (2).) " 'If neither of these tests is met, that is the end of the inquiry, and the court need not enforce the parties' choice of law. If, however, either test is met, the court must next determine whether the chosen state's law is contrary to a *fundamental* policy of California. If there is no such conflict, the court shall enforce the parties' choice of law. If, however, there is a fundamental conflict with California law, the court must then determine whether California has a "materially greater interest than the chosen state in the determination of the particular issue . . . ." (Rest.[2d Conf. of Laws], § 187, subd. (2).)' " (*Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906, 916 [103 Cal.Rptr.2d 320, 15 P.3d 1071], quoting *Nedlloyd Lines B.V. v. Superior Court* (1992) 3 Cal.4th 459, 466 [11 Cal.Rptr.2d 330, 834 P.2d 1148].)

the proposition that Georgia would not deem a class action waiver unconscionable in these circumstances, and contends that we must apply Georgia law to the class action waiver.

There is a significant distinction between the present case and the situation in *Discover Bank*. Plaintiff there was "not . . . seeking to enforce an obligation imposed by the CLRA or any other California statute." (*Discover Bank, supra,* 36 Cal.4th at p. 174.) He instead brought a cause of action under the Delaware Consumer Fraud Act and Delaware contract law and sought "to enforce those Delaware laws in a California court with a California unconscionability rule against class action waivers that arguably is not found under Delaware law." (*Ibid.*) In remanding the matter for consideration of choice-of-law issues, the Supreme Court specifically distinguished *America Online, Inc. v. Superior Court* (2001) 90 Cal.App.4th 1 [108 Cal.Rptr.2d 699], where the claim was brought under California's CLRA and the Court of Appeal concluded that the class action remedy "furthered a 'strong public policy of this state.' " (*Discover Bank, supra,* at p. 174, quoting *America Online, Inc. v. Superior Court, supra,* at p. 15.)

We concur that enforcement of California law with respect to the unconscionability of the class waiver provision is appropriate for the reasons discussed in *America Online, Inc.* At issue there was a dispute between an Internet subscriber and its provider, wherein the allegation was made that the provider continued to debit subscribers' credit cards for monthly service fees after they terminated their subscriptions. The action was brought under the CLRA. The forum selection clause in the provider's contracts with subscribers designated Virginia as the jurisdiction in which all disputes arising out of the relationship would be litigated.

Comparing the CLRA with Virginia consumer protection laws, the court found a number of differences in the breadth of protection afforded. Plaintiffs under the CLRA "may be entitled to a minimum recovery of $1,000, restitution or property, power of injunctive relief, and punitive damages. [Citation.] Attorney fees and costs are also recoverable if the plaintiffs prevail on their claim under the act. [Citation.] In addition to these extraordinary remedies, if the complaining consumer is a senior citizen or disabled person, up to $5,000 may be awarded for substantial physical, emotional distress, or economic damage. [Citation.] Of course, the CLRA specifies that actions under that act may be prosecuted as class actions." (*America Online, Inc. v. Superior Court, supra,* 90 Cal.App.4th at p. 15, fn. omitted.) Virginia, on the other hand, permitted a minimum recovery—that is, the recovery allowed absent proof of actual damages—of only $500 unless willful misconduct was proven. Restitution and attorney fees were available, but the law did not appear to allow private persons to obtain injunctive relief on behalf of others similarly situated.

**(9)** Of greater importance to the court, however, was "the absence of any provision in the [Virginia consumer law] that allows suits under the act to proceed as class actions." (*America Online, Inc. v. Superior Court, supra,* 90 Cal.App.4th at p. 17.) The court discussed the fact that in contrast to Virginia's apparent hostility to class actions, class actions are considered an important consumer tool in California, citing *Vasquez v. Superior Court* (1971) 4 Cal.3d 800 [94 Cal.Rptr. 796, 484 P.2d 964]. There, "Justice Mosk, writing for a unanimous Supreme Court, first noted that '[p]rotection of unwary consumers from being duped by unscrupulous sellers is an exigency of the utmost priority in contemporary society.' [Citation.] . . . Justice Mosk then explained the importance of class actions as an instrumentality of consumer protection: 'Frequently numerous consumers are exposed to the same dubious practice by the same seller so that proof of the prevalence of the practice as to one consumer would provide proof for all. Individual actions by each of the defrauded consumers is often impracticable because the amount of individual recovery would be insufficient to justify bringing a separate action; thus an unscrupulous seller retains the benefits of its wrongful conduct. A class action by consumers produces several salutary by-products, including a therapeutic effect upon those sellers who indulge in fraudulent practices, aid to legitimate business enterprises by curtailing illegitimate competition, and avoidance to the judicial process of the burden of multiple litigation involving identical claims. The benefit to the parties and the courts would, in many circumstances, be substantial.' " (*America Online, Inc. v. Superior Court, supra,* at p. 17, quoting *Vasquez v. Superior Court, supra,* 4 Cal.3d 808.)

Here, there is no dispute that the first part of the Restatement's test has been met: EarthLink has a substantial relationship to Georgia and a reasonable basis for choosing Georgia law since its principle place of business is there. But Aral resides in California, seeks to represent only California consumers, and relies solely on California's UCL to support his claim. The fundamental policy at issue is not simply the right to pursue a class action remedy, but the right of California to ensure that its citizens have a viable forum in which to recover minor amounts of money allegedly obtained in violation of the UCL. Forcing consumers to travel to a far location and depriving them of any hope of class litigation would pose an insurmountable barrier to recovery of small sums unjustly obtained, and undermine the protections of the UCL. There is no doubt that California has a "materially greater interest than [Georgia] in the determination of [this] particular issue . . . ." (Rest.2d Conf. of Laws, § 187, subd. (2).)

## DISPOSITION

The order denying the petition to compel arbitration and to dismiss or stay court proceedings is affirmed.

Epstein, P. J., and Hastings, J., concurred.